**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| JULIE SU, Acting Secretary of the United States Department of Labor, | * | |
| | * | |
| *Plaintiff*, | * | |
| | * | |
| v. | * | Civil No. 23-836-JRR |
| | * | |
| PROTECTIVE SERVICE OFFICERS UNITED, | * | |
| | * | |
| *Defendant*. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM OF LAW IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT**

The United States of America, on behalf of Julie A. Su, the Acting Secretary of the United States Department of Labor, hereby submits this Memorandum of Law in support of its Motion for Summary Judgment.

**INTRODUCTION**

The Department of Labor initiated this case against Protective Service Officers United ("PSOU") to ensure that PSOU's members are able to fully participate in the election of their union officers – a right that is enshrined in Title IV of the Labor-Management Reporting and Disclosure Act ("LMRDA"). PSOU violated the LMRDA during its September 30, 2022 election of union officers in two ways: (i) by failing to send its members proper notice of altered voting times and procedures, and (ii) by using an unannounced roaming ballot box at only one worksite during only a portion of the voting hours, thereby disadvantaging some members. Because these violations may have affected the outcome of the election, the sole statutory remedy for such violations of Title IV of the LMRDA is a new election conducted under the Secretary's supervision. Summary judgment should be entered for the Department of Labor.

3

**PROCEDURAL HISTORY**

The Department of Labor filed a Complaint against PSOU on March 27, 2023. ECF No. 1. The Department alleged that PSOU violated Title IV of the Labor-Management Reporting and Disclosure Act, 29 U.S.C. §§ 481-83 ("LMRDA"). ECF No. 1, Compl. ¶¶ 59-64. Specifically, the Department alleges that PSOU violated 29 U.S.C. § 481(c), also referred to as Section 401(c), and 29 U.S.C. § 481(e), also referred to as Section 401(e), of the LMRDA. *Id.* After PSOU filed an Answer, ECF No. 5, the Department filed a Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgment. ECF No. 13. In its Opposition, among other arguments, PSOU argued that the case was not "ripe for judgment on the pleadings" because it "has not even had the opportunity to engage in discovery." ECF No. 14 at 8. Appearing to rely on PSOU's argument regarding discovery, the Court denied the Department of Labor's dispositive motion, stating that "considering that the parties have not had any opportunity for discovery prior to the filing of the Motion, Plaintiff has not met her burden to demonstrate 'to a certainty' that Defendant 'cannot prove any set of facts' in support of its defense." ECF No. 21 at 8. And because discovery had not occurred, the Court felt that "[j]udgment at this stage would be premature." *Id.*

After the Motion for Judgment was denied, the Department served written discovery requests and received PSOU's written answers and a production. Yet, despite is plea for discovery in briefing, PSOU took no discovery. In fact, aside from the Department's written discovery requests, no discovery was taken at all. The Parties agreed to written stipulations of fact at the close of discovery, which largely (if not completely) mirror the facts alleged in the Department's Complaint. *Compare* ECF No. 1 *with* Ex. 1.

**LEGAL BACKGROUND**

The principal goal of Title IV of the LMRDA "is to insure 'free and democratic' [union] elections." *Wirtz v. Local 153, Glass Bottle Blowers Ass'n*, 389 U.S. 463, 470 (1968); *see also Wirtz v. Hotel, Motel & Club Emps. Union, Local 6*, 391 U.S. 492, 496 (1968). Through the LMRDA, Congress sought to "protect the rights of rank-and-file members to participate fully in the operation of their union through processes of democratic self-government, and, through the election process, to keep the union leadership responsive to the membership." *Hotel, Motel & Club Emps. Union*, *Local 6*, 391 U.S. at 497; *see also Local 153*, 389 U.S. at 469-71.

In protecting union members' right to vote, Congress imposed an express requirement on unions to notify members of upcoming elections. Section 401(e) of the Act states that "[n]ot less than fifteen days prior to the election notice thereof shall be mailed to each member at his last known home address." 29 U.S.C. § 481(e). Proper notice of the election must include information as to the date, time, and place of the election and the offices to be filled. *Dole v. Nat'l Post Office Mail Handlers, Loc. Union 317*, 711 F. Supp. 577, 579 (M.D. Ala. 1989) (finding that the union's mailing was "wholly inadequate in terms of providing effective notice" of the election under Section 401(e) because it failed to include the specific date that mail ballots were due); *see also* 29 C.F.R. § 452.99.[1] Consistent with the statutory purpose and settled case law, the Department of Labor's regulations mandate that any changes to the timing of an election must be followed by a timely corrected notice to members reflecting such changes. *See* 29 C.F.R. § 452.104(b) ("Should

---

[1] The Secretary's interpretive regulations are not binding, but courts rely on them as persuasive aids in interpreting the provisions of Title IV of the LMRDA. *See, e.g.*, *BLE Int'l Reform Comm. v. Sytsma*, 802 F.2d 180, 190 (6th Cir. 1986) ("While it is true that the Secretary's regulations are not controlling on federal courts, it is equally clear that when faced with a problem of statutory construction, federal courts show great deference to the interpretation given the statute by the officers or agency charged with its administration." (internal alterations and quotation omitted)); *Donovan v. Sailors' Union of the Pacific*, 739 F.2d 1426, 1429 (9th Cir. 1984) (noting Secretary's interpretation of Title IV "entitled to consideration"); *Alvev v. General Electric Company*, 622 F.2d 1279, 1286 n.7 (7th Cir. 1980) (Secretary's regulations "provide guidance").

a union change the date of an election from the date originally announced in the mail notice to the members, it must mail a second notice, containing the correct date, at least 15 days before the election."). Nothing short of strict compliance with the method and timing of the notice requirement is sufficient. *See, e.g., Brennan v. Local Union No. 639, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 494 F.2d 1092, 1097 (D.C. Cir. 1974) ("It is clear that Congress intended at a minimum that notice be mailed to each member and that other means, however reasonable, were insufficient."); *Loc. Union 317*, 711 F. Supp. at 580 (holding that union's arguments about sufficiency of alternative means of notice "fail . . . against the explicit statutory language which requires notice by use of the mails"). Indeed, this Court has previously held that a "reasonableness" standard is not appropriate in determining compliance with the election notice requirement. *Hugler v. Loc. 689, Amalgamated Transit Union*, 266 F. Supp. 3d 855, 862 (D. Md. 2017) ("The 'reasonableness of a union's conduct' is not a defense[.]").

Section 401(c) of the Act further mandates that unions provide "[a]dequate safeguards to insure a fair election . . . ." 29 U.S.C. § 481(c). With this requirement, "[a] labor organization's wide discretion regarding the conduct of its election is . . . circumscribed by a general rule of fairness." 29 C.F.R. § 452.110(a); *see, e.g., Donovan v. Graphic Arts Int'l Union,* 1984 WL 49068, at *5 (C.D. Ill. 1984); *Brock v. Writers Guild of Am., West, Inc.,* 762 F.2d 1349, 1353-54 (9th Cir. 1985).

If the Government establishes that there was a violation of Section 401 of the LMRDA, Section 402(c) requires that federal district courts declare a contested election void and order a new election under the Secretary's supervision where the violation "may have affected the outcome of the election." 29 U.S.C. § 482(c). A court does not need to find that a proven violation actually affected the outcome of an election; it merely needs to find that the violation *may* have

6

affected the outcome. *Id.*; *see also Hotel, Motel & Club Emps. Union, Local 6*, 391 U.S. at 506. By establishing a violation of Section 401, the Secretary establishes a *prima facie* case that the violation may have affected the outcome of the election, whereupon the burden of proof shifts to the union to produce tangible evidence that the results of the election would have been the same absent the violation. *Id.* at 506-07; *see also Usery v. Stove, Furnace, & Allied Appliance Workers Int'l Union*, 547 F.2d 1043 (8th Cir. 1977); *Donovan v. Local 738, UAW*, 575 F. Supp. 52, 55 (D. Md. 1983)); *Solis v. Local 9477, United Steelworkers*, 798 F. Supp. 2d 701, 705 (D. Md. 2011).

## **FACTUAL BACKGROUND**

The material facts are undisputed. PSOU is, and at all times relevant to this action has been, an independent, local labor organization. ECF No. 5 ¶ 7.[2] PSOU's election was subject to the provisions of Title IV of the LMRDA. *Id.* ¶¶ 13-14. At the time of the election, PSOU members were employed as security officers at the following worksites: the White Oak campus of the U.S. Food and Drug Administration ("FDA White Oak") worksite; the Federal Emergency Management Agency ("FEMA") worksite; and the United States Citizenship and Immigration Service ("USCIS") worksite. *Id.* ¶ 9; Ex. 1 ¶¶ 1-2.

Prior to the Election, on September 11, 2022, PSOU distributed an election notice to its members. ECF No. 5 ¶ 16; Ex. 1 ¶ 8. The election notice stated that the election would be conducted via in-person polling sites and that voting hours would be from 10:30 a.m. to 4:30 p.m. ECF No. 5 ¶¶ 13-14, 18; Ex. 1 ¶¶ 9-10. The Election Notice further stated that voting would occur at three locations: (1) the White Oak Library, located at 11701 New Hampshire Ave. in Silver Spring, Maryland; (2) the FEMA Caucus Conference Room, located at 500 C Street in Washington, D.C.; and (3) the USCIS offices, located at 5600 Capital Gateway Drive in Camp

---

[2] Unless otherwise indicated, citations to the Answer necessarily include citations to the corresponding allegations in the Complaint.

Springs, Maryland. ECF No. 5 ¶ 17; Ex. 1 ¶ 9. The FEMA and USCIS polling locations were onsite or within walking distance of the FEMA and USCIS worksite locations, respectively. Ex. 1 ¶ 12. The polling site closest to the FDA White Oak worksite was located at the White Oak Library, which is approximately 1.2 miles from FDA White Oak worksite. Ex. 1 ¶ 13.

After the election notices were posted, members and candidates complained that the voting hours would were not sufficiently long to permit them to vote. Ex. 1 ¶ 14. Members working during the first and second "relief" shifts at the FDA White Oak worksite were particularly concerned that they would not be able to vote during the posted voting times given the distance to the library and the fact that they would be on duty for the entire polling period indicated in the election notice. Ex. 1 ¶ 15.

To address these complaints, at some point between September 27, 2022 and September 30, 2022, PSOU President Chrissandra Jones agreed to have member Ervin Covington carry the ballot box ("the roaming ballot box") around to individual guard stations at the FDA White Oak worksite beginning around 4 a.m. on the day of the election. ECF No. 5 ¶ 21; Ex. 1 ¶ 16. After that, the PSOU Executive Board decided that there could be no more changes to the election process because it was causing confusion among the membership. Ex. 1 ¶ 19. Although PSOU's Executive Board has the authority to employ absentee balloting without membership approval, absentee balloting was not made available in the election. *Id.* ¶¶ 44-45. And, PSOU admits that members who were working at times or locations other than the first and second shifts at the FDA White Oak worksite would not have been able to vote at their duty station via the roaming ballot box and were instead required to vote at the listed polling sites. ECF No. 5 ¶ 39; Ex. 1 ¶¶ 31-32.

Around the same time, President Jones told the polling attendants at the FEMA and USCIS worksites that they could open the polls at 6 a.m. and 8 a.m., respectively –hours earlier than the

10:30 a.m. starting time contained in the election notice. *Id.* ¶¶ 20-21. President Jones verbally changed the opening polling times at the USCIS and FEMA sites because she believed it would not be fair to let members vote at FDA White Oak via the roaming ballot box prior to the time stated on the election notice and not have the other polling sites open early. *Id.* ¶ 22.

At no point prior to the election did PSOU provide written notice to its members that the polls would open early or that Mr. Covington would be walking the ballot box around the FDA White Oak worksite on the day of the Election. ECF No. 5 ¶¶ 25, 28; Ex. 1 ¶¶ 23-24.

On the day of the Election, the polls at all three voting sites opened prior to 10:30 a.m.—the starting time set forth in the Election Notice. ECF No. 5 ¶¶ 29-32; Ex. 1 ¶ 25. Mr. Covington and another PSOU member, Adrian Petrus, walked the ballot box to individual guard stations at the FDA White Oak worksite starting between 5:00 a.m. and 6:00 a.m. ECF No. 5 ¶¶ 32, 36-38; Ex. 1 ¶ 26. Neither Covington nor Petrus can attest that they took the box to every eligible voter who was at the FDA White Oak worksite during that time period. Ex. 1 ¶ 27. After Covington and Petrus walked to individual guard stations at FDA White Oak with the ballot box, Mr. Covington took the ballot box to Building 22 on the FDA White Oak worksite around 8:30 a.m., where he stayed for about an hour. *Id.* ¶ 28. PSOU members would have only been able to learn that Mr. Covington was with the ballot box at Building 22 through word of mouth. *Id.* ¶ 29. Mr. Covington then brought the ballot box to the White Oak Library, where voting resumed at around 11:00 a.m. *Id.* ¶ 30. The ballot box was only walked to individual guard stations during the first and second shifts at the FDA White Oak worksite. ECF No. 5 ¶¶ 38-39; Ex. 1 ¶¶ 31-32. The ballot box was not walked to individual guard stations during the third shift at FDA White Oak, and it was not walked to individual guard stations at FEMA and USCIS worksites. ECF No. 5 ¶¶ 38-39; Ex. 1 ¶¶ 31-32.

The contested races in the election were for the offices of President and three Trustee positions. ECF No. 5 ¶ 45; Ex. 1 ¶ 37. At the time of the election, approximately 400 PSOU members were eligible to vote. ECF No. 5 ¶ 48; Ex. 1 ¶ 40. There were 136 votes counted as cast in the Election. ECF No. 5 ¶ 49; Ex. 1 ¶ 43. The margin of victory in the President's race was 11 votes. ECF No. 5 ¶ 46; Ex. 1 ¶ 38. The margin of victory in the Trustees' race was 10 votes. ECF No. 5 ¶ 47; Ex. 1 ¶ 39. There were 74 PSOU members who voted at the FDA White Oak worksite via the roaming ballot box, and there were only 21 PSOU members who voted at the White Oak Library. ECF No. 5 ¶¶ 40-41; Ex. 1 ¶¶ 33-34. There were 24 members who voted at the FEMA worksite and 18 members who voted at the USCIS worksite. Ex. 1 ¶¶ 35-36.

Robin Gregory, a PSOU member, properly filed a complaint regarding these matters with the Secretary of Labor. ECF No. 5 ¶¶ 51-56; Ex. 1 ¶¶ 46-53. The Secretary investigated and now brings this action against PSOU pursuant to Section 402(b) of the Act. 29 U.S.C. § 482(b).

## STANDARD OF REVIEW

Under Rule 56(a), a court shall grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a). A fact is "material" when it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. The inquiry under Rule 56 is essentially "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52.

The moving party's burden of proving that there are no genuine facts in dispute may— though need not—be met by consideration of affidavits, exhibits, depositions, and other discovery

materials. *See* Fed. R. Civ. P. 56; *see also Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir. 1984). However, the moving party will be granted summary judgment if, with or without these accompanying materials, it demonstrates that summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (holding that summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action'") (quoting Fed. R. Civ. P. 1). Once the moving party presents a properly supported motion for summary judgment, it is the non-moving party's burden to set forth specific facts, through affidavits or other evidence, that there is a genuine issue for trial. Fed. R. Civ. P. 56(c). This burden is "particularly strong when the non-moving party [also] bears the burden of proof." *Caussade v. Brown*, 924 F. Supp. 693, 696 (D. Md. 1996) (citations omitted) (correction in original). Furthermore, the "non-movant 'cannot create a genuine issue through mere speculation or the building of one inference upon another.'" *Id*. at 696-97 (quoting *Beale v. Hardy*, 769 F.2d 2213, 2214 (4th Cir. 1985)). "[T]he Court must also abide by its affirmative obligation to prevent factually unsupported claims and defenses from going to trial." *Loc. 689, Amalgamated Transit Union*, 266 F. Supp. 3d at 860 (citing *Drewitt v. Pratt,* 999 F.2d 774, 778–79 (4th Cir. 1993)).

## **ARGUMENT**

Summary judgment should be entered for the Department of Labor because PSOU violated the LMRDA, and those violations may have affected the outcome of the election.

I.    **PSOU VIOLATED SECTIONS 401(E) AND 401(C) OF THE LMRDA.**

a.    **Defendant Failed to Notify its Members of Changes to the Timing and Method of Voting, in Violation of Section 401(e) of the LMRDA.**

On the eve of its September 30, 2022 election, PSOU changed polling hours and procedures but did not notify its members of those changes. PSOU's failure to adhere to the LMRDA's basic notice requirements violated the LMRDA.

As stated above, the Department of Labor's regulations mandate that any changes to the timing of an election must be followed by a timely corrected notice to members reflecting such changes. *See* 29 C.F.R. § 452.104(b) PSOU changed the polling times of the election but failed to timely advise its members of this change as required. The hours provided in PSOU's original election notice were from 10:30 a.m. to 4:30 p.m. This notice was distributed on September 11, 2022, three weeks before the election, as required, which is sufficient time to allow members an create a plan to vote. *See* ECF No. 5 ¶ 18; Ex. 1 ¶ 10. Yet, PSOU opened the polls and received votes as early as 5:00 or 6:00 a.m. at the FDA worksite, and at 6:00 a.m. and 8:00 a.m. at FEMA and USCIS, all well before the 10:30 a.m. time noticed by PSOU. Ex. 1 ¶¶ 20, 21, 26.

PSOU also changed the method of voting and failed to provide proper notice of the method change. As explained above, PSOU members Covington and Petrus carried the ballot box around the FDA White Oak worksite, collecting votes prior to opening the polling site at the White Oak Library. ECF No. 5 ¶¶ 25, 28-32; Ex. 1 ¶¶ 25-26. Yet, the election notice indicated that ballots would only be collected at the White Oak Library, FEMA Conference Room, and USCIS offices. Ex. 1 ¶ 9. PSOU's roaming ballot box method of vote collection was not announced in its election notice, and this method was never communicated to PSOU's members before the election. ECF No. 5 ¶¶ 27, 28; Ex. 1 ¶¶ 23-24.

12

Both of these changes – PSOU's departure from the ***timing*** and ***ballot collection procedures*** on its own election notice – violated the LMRDA. *See Donovan v. Int'l Ass'n of Machinists, Loc. Lodge 851*, 622 F. Supp. 394, 397 (N.D. Ill. 1985) (finding that even where a member could know the date of a union's nomination meeting, the failure to include the time and place of the meeting in the notice violated the LMRDA). As an example, in *Brock v. Dist. 6, United Mine Workers of Am.*, 772 F.2d 905, 1985 WL 13586, (6th Cir. 1985) (unpublished), the court deemed a union's election notice insufficient for failing to state that an alternative voting site would be provided if one closed due to inclement weather. *Id*. Thus, a union's failure to inform members of ***additional*** opportunities to vote violates the LMRDA, even if the member had been previously made aware of other opportunities to vote. *See id.* The LMRDA requires unions to notify their members of "the date, time and place of the election," not ***some*** of the times or ***some*** of the places where the election will occur. 29 C.F.R. § 452.99; *see also Dist. 6,* 1985 WL 13586 at *5 (stating that the statutory election notice must "specify the date, time and place of the election" and that "[a] notice that disenfranchises even a few voters violates the Act").

Further illustrating that PSOUs election changes constitute violations of the LMRDA, in *Wirtz v. Loc. Union 262, Glass Bottle Blowers Ass'n of U. S. & Canada*, the court found that the union violated Section 401(e) of the LMRDA when it permitted the use of absentee ballots but failed to include this information in its election notice. 290 F. Supp. 965, 968 (N.D. Cal. 1968). "As a result, some members were aware of the availability of absentee voting and many others were not." *Id.* Like PSOU, the union in *Local Union 262* was not required to offer this additional means of voting, but once offered, it was required to inform the membership of its availability. *Id.*

In sum, effective notice of an election under the LMRDA must contain accurate and complete information regarding when, where, and how members will be able to vote. Accordingly,

when PSOU strayed from the voting times and voting methods on the September 11, 2022 notice without properly notifying the members of those changes, PSOU violated the LMRDA. Both of these departures from the procedures set forth in the election notices are sufficient to establish a *prima facie* case of a LMRDA violation by PSOU. In demonstrating the above violations, the Secretary has established a *prima facie* case that those violations may have affected the outcome of PSOU's election. *See* 29 U.S.C. § 482(c); *Chao v. Branch 4798 Nat. Ass'n of Letter Carriers,* 532 F. Supp. 2d 783, 790 n.12 (E.D. Va. 2008) ("[T]he existence of the violations [including a notice violation] and their nature points persuasively to the conclusion that the outcome may have been affected.").

> **b. PSOU Failed to Ensure Adequate Safeguards Were Provided when it Permitted the Use of an Unannounced Roaming Ballot Box for Only a Portion of the Membership, in Violation of Section 401(c) of the LMRDA.**

In addition to the above-mentioned violations of Section 401(e) of the LMRDA, PSOU also violated the fairness principle in Section 401(c) of the LMRDA by using an unannounced, unregulated, and unevenly deployed roaming ballot box during the election. Consistent with the broad aims of Section 401(c), courts have found LMRDA violations when union election procedures deprive union members of a full and fair opportunity to vote. *See Dole v. Graphic Comm. Int'l Union*, 722 F. Supp. 782, 785–86 (D.D.C. 1989) (union failed to give members adequate notice that, under a new direct mail ballot procedure, ballots mailed in bulk would not be counted); *Dole v. Local Union 317*, 711 F. Supp. 577, 581 (M.D. Ala. 1989) (union separately mailed instructions one month before ballot and there was evidence that the members were confused about or ignorant of specific instructions); *McLaughlin v. Local Union 1000, Civil Serv. Emps. Ass'n, AFSCME*, No. 87-CV-94, 1988 WL 28987 at *2 (N.D.N.Y. Mar. 28, 1988) (union abolished write-in vote option but mistakenly included option on ballot and did not notify voters

once error was discovered); *Wirtz*, 290 F. Supp. at 968 (union did not ensure adequate safeguards "surrounding the distribution, handling and counting of absentee ballots").

Much like in *Brock*, PSOU's failure to provide complete and accurate notice of where, when, and how the election was to proceed may have deprived some members of the opportunity to participate. 1985 WL 13586 (holding that the adequate safeguards provision of the LMRDA was violated when the union's notice did not fully and accurately inform members of the use of a roaming ballot box). Similarly, here, if a PSOU member was unable to get to the polls between 10:30 a.m. and 4:30 p.m. (the times listed on the election notice), that member reasonably could have assumed that it was impossible for them to vote and not participated in the election at all. But had they known that polls opened at 6:00 a.m., or if that member would have known where and when a roaming ballot box would be available, the member could have arranged to vote earlier or at their own work-station via the roaming ballot box. Without proper notice, this opportunity may have been lost.

Additionally, PSOU provided no safeguards around the use of the roaming ballot box. PSOU members Covington and Petrus approached guard stations at their own discretion and cannot attest that they took the box to every eligible voter who was at the FDA White Oak worksite during that time period. Ex. 1 ¶ 27. There was no structure around how the box would be circulated, and PSOU did nothing to ensure that all of its members were informed about the existence and location of the roaming ballot box, which resulted in members learning about its existence and location through word of mouth. Ex. 1 ¶ 29. As such, members may not have known about the roaming ballot box, and even if they knew, they may not have even been able to find it because they had not been provided with notice of the roaming ballot box's location. *See id.*

Underscoring the importance of PSOU's haphazard use of an unannounced roaming ballot

box, PSOU has admitted that the various changes to the election procedures were causing confusion among the membership. Ex. 1 ¶ 19. The roaming ballot box method of voting only benefited PSOU members that were on duty at this one worksite between 5 a.m. and 8:30 a.m. This method, therefore, gave on-duty, FDA members of PSOU unequal access to otherwise unknown voting opportunities. Members working during other shifts at FDA would have to travel 1.2 miles to an off-site library to vote, and members working at FEMA and USCIS were not able to vote at their duty stations and instead needed to do so at the listed polling site on their own time. ECF No. 5 ¶ 39; Ex. 1 ¶¶ 31-32. By greatly expanding voting options for only some members – by letting them vote at their work-stations while on duty – but not other members, PSOU ran afoul of the LMRDA's basic fairness requirement. 29 C.F.R. § 452.110.

This is comparable to the situation in *Hugler v. Loc. 689, Amalgamated Transit Union*, 266 F. Supp. 3d 855 (D. Md. 2017). There, the union permitted candidates to regain good standing through an alternative repayment plan, but that alternative was not announced publicly to the membership and was only made available when someone inquired. *Hugler*, 266 F. Supp. 3d at 858, 862. Judge Hazel noted that "[s]ome members were not aware that the payment plan option existed," and held that this fact equated to a violation of the LMRDA. *Id.* at 862 (ruling on dispositive motions, and not requiring a trial). Although this was a case involving the LMRDA's requirement that unions apply only "reasonable qualifications uniformly imposed," 29 U.S.C. § 481(e), the inherent unfairness of a system where only certain members are aware of and can access voting opportunities is equally applicable under the "adequate safeguards" analysis of Section 401(c), 29 U.S.C. 481(c).

If PSOU wished to expand access to the polls, it needed to have done so in a manner that gave all voters notice and an equal opportunity to take advantage of this option. *See* 29 U.S.C. §

481(e); *see also Loc. 689, Amalgamated Transit Union*, 266 F. Supp. 3d at 862 ("Defendant's good intentions do not operate as a barrier against the clear mandate of the LMRDA."). For example, the Executive Board could have allowed the use of absentee ballots for members whose shifts or other commitments prevented them from voting in person – an entirely foreseeable election challenge – assuming it provided proper notice of this option. Instead, PSOU adopted, without notice, a new procedure on the eve of the Election that unfairly benefited some members over others.

The vote tallies from each location illustrate the unfair and uneven nature of PSOU's roaming ballot box procedure. 136 PSOU members voted in the election. Ex. 1 ¶ 43. Over half, 54.4%, of these 136 votes were cast by 74 PSOU members at the FDA White Oak worksite via the roaming ballot box. *See id.* ¶ 33. Further still, where there were 74 votes cast at the FDA White Oak worksite via the roaming ballot box, but there were only 21 PSOU members who voted at the White Oak Library. ECF No. 5 ¶¶ 40-41; Ex. 1 ¶¶ 33-34. This data point alone demonstrates the unfair nature of PSOU's use of a roaming ballot box. The ballot box was walked around the FDA worksite for approximately four hours. Ex. 1 ¶¶ 26-30. The ballot box was available to other FDA members at the White Oak Library from 11 a.m. to 4:30 p.m. *Id.* ¶ 30. So, despite the fact that FDA members had more time to vote at the White Oak Library, less than one-third of the FDA member votes were cast at the Library. *See id.* ¶¶ 26-30, 33-34. PSOU violated the fairness principle in Section 401(c) of the LMRDA by using an unannounced, unregulated, and unevenly deployed roaming ballot box during the election.

## II.    PSOU'S VIOLATIONS MAY HAVE AFFECTED THE OUTCOME OF THE ELECTION.

The Department of Labor has established that PSOU violated the LMRDA by (1) failing to notify its members of the updated time and method of voting despite a change from its notice;

17

and (2) using a roaming ballot box in a manner that violates the fairness principle of Section 401(e). Because it has established LMRDA violations, Section 402(c) requires that federal district courts declare a contested election void and order a new election under the Secretary's supervision where the violation "may have affected the outcome of the election." 29 U.S.C. § 482(c). The Court does not need to find that a proven violation actually affected the outcome of an election; it merely needs to find that the violation *may* have affected the outcome. *Id.*; *see also Hotel, Motel & Club Emps. Union, Local 6*, 391 U.S. at 506. By establishing a violation of Section 401, the Secretary establishes a *prima facie* case that the violation may have affected the outcome of the election, whereupon the burden of proof shifts to the union to produce tangible evidence that the results of the election would have been the same absent the violation. *Id.* at 506-07; *see also Usery v. Stove, Furnace, & Allied Appliance Workers Int'l Union*, 547 F.2d 1043 (8th Cir. 1977); *Donovan v. Local 738, UAW*, 575 F. Supp. 52, 55 (D. Md. 1983)); *Solis v. Local 9477, United Steelworkers*, 798 F. Supp. 2d 701, 705 (D. Md. 2011).

With respect to the legal impact of a violation, "[e]ffect is presumed from a violation unless the union meets its evidentiary burden to produce 'tangible evidence' that the election would not have been different absent the violation." *Acosta v. Loc. 41, Int'l Bhd. of Teamsters*, 2020 WL 11563944, at *4–5 (W.D. Mo. Feb. 10, 2020) (quoting *Hotel Employees Union Local 6*, 391 U.S. at 507-08). In meeting this burden, a defendant may not rely on evidence that is "speculative" or "conjecture." *Hotel, Motel & Club Emps. Union, Local 6*, 391 U.S. at 507–08.

When analyzing whether the evidence supports or defeats the presumption, courts apply the "maximum theoretical possibility" theory, which "assumes that all those who could have voted would have voted and that those who would have voted would have voted unanimously." *Marshall v. Am. Postal Workers Union, AFL-CIO*, 486 F. Supp. 79, 82 (D.D.C. 1980), decision

18

supplemented, No. 79-1440, 1980 WL 2063 (D.D.C. Mar. 11, 1980); *see also Dole v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., Local 996*, 1990 WL 251022 (D. Haw. May 2, 1990) (finding it to be "theoretically possible" that enough of the ballots lost by the union should have been counted and could have changed the outcome of the challenged race "if all the eligible votes were counted"); *Dole v. Graphic Commc'ns Int'l Union*, 722 F. Supp. 782, 786 (D.D.C. 1989); *Marshall v. Am. Postal Workers Union*, 486 F. Supp. 79, 82 (D.D.C. 1980) (upholding presumption that violation affected the maximum number of votes possible); *Loc. Union 317*, 711 F. Supp. at 583 ("The presumption further implies that a sufficient number of these untimely ballots would have been voted for the second-place candidate in each race to affect the outcome of that race.");

The effect of PSOU's failure to notify all members of the changes to the election times and procedures, including the use the roaming ballot box, can be measured by the number of members who were eligible to vote in the election but did not do so. *See, e.g., Loc. 689*, 266 F. Supp. 3d at 862 (finding that the effect was "every eligible member that did not vote" where the union sent out the election notice 14, rather than 15, days before the election); *Chao v. United Food & Commercial Workers Union*, 307 F. Supp. 2d 1027, 1035–36 (W.D. Wis. 2004) (court counts number of eligible members who did not vote and did not receive election notice); *Loc. 54*, 166 F. Supp. 2d at 124 ("If Local 54 had complied with its statutory duty to mail election notice to each union member's last known address . . . the level of participation in the June 1999 election would very likely have been substantially higher. With more members given an opportunity to cast their ballots, the outcome of the election necessarily 'may have been affected.'"). Relatedly, the Department of Labor need not prove that "those members not given notice would have actually

19

voted or did not get notice from" other sources. *Wirtz v. Loc. Union No. 1622, United Bhd. of Carpenters & Joiners of Am., AFL-CIO*, 285 F. Supp. 455, 465 (N.D. Cal. 1968).

At the time of PSOU's election, approximately 400 members were eligible to vote. ECF No. 5 ¶ 48; Ex. 1 ¶ 40. There were 136 votes cast in the election. ECF No. 5 ¶ 49; Ex. 1 ¶ 43. Thus, under the governing "maximum theoretical possibility," 264 additional PSOU members could have voted had they been given timely and proper notice of both the expanded voting hours and the access to the roaming ballot box, both of which could have made it easier for all members to vote, instead of only a select portion. Certainly, 264 additional voters could have affected the outcome of the election, because the margins of victory for both positions were 11 votes and 10 votes, respectively. ECF No. 5 ¶¶ 46-47; Ex. 1 ¶¶ 38-39; *see Loc. Union 262,* 290 F. Supp. at 968–69 (finding that the union's failure to notify members of the availability of absentee ballots may have affected the outcome of the election where the margin of victory was four votes and "[m]ore than four members who did not vote may have voted had the availability of absentee ballots been known to them"); *Brock v. Dist. 6, United Mine Workers of Am.,* 772 F.2d 905 (6th Cir. 1985) (reversing the district court's finding that the union had satisfied its rebuttal burden where it offered no proof "respecting whether the effect of the notice on non-voting members affected the outcome of the election").

This evidence alone, under the governing principle of "maximum theoretical possibility," is sufficient for the Court to find that PSOU's violations "may have effected" the outcome of the election, and in turn enter summary judgment for the Department. Further still, although it is certainly not the Department's burden to present evidentiary proof of the effect of the violations, *see Hotel, Motel & Club Emp. Union, Loc. 6,* 391 U.S. 492, 506-07, it is evident that PSOU's decision to allow two members to walk the ballot box around the FDA White Oak worksite favored

20

those voters who had access to the roaming ballot box. *See* Ex. 1 ¶¶ 33-34 (74 members voted via the roaming ballot box, and only 21 members voted at the White Oak Library, despite that the ballot box was available at the library for an equal or greater time). Among the FDA voters, 74 PSOU members voted via the roaming ballot box, compared to 21 members who voted at the White Oak Library (the original balloting location stated in the election notice), and this lopsided imbalance existed despite the fact that the ballot box was accessible for longer at the Library. ECF No. 5 ¶¶ 40-41; Ex. 1 ¶¶ 33-34. Among all voters, the 74 members who voted onsite at FDA White Oak make up 54% of the total votes cast in the election. ECF No. 5 ¶ 42; Ex. 1 at ¶ 42. Turnout was significantly higher for those whom were approached at their work station, indicating that had all members received the same treatment, the outcome of the election may have been affected. Summary judgment should be entered for the Department of Labor.

## III.   SUMMARY JUDGMENT IS APPROPRIATE.

Although Section 402(c) of the LMRDA provides that a court shall vacate a violative election and order a new election under the Secretary's supervision following "a trial upon the merits," 29 U.S.C. § 482(c), courts have consistently held that suits under Title IV of the LMRDA may be resolved at the summary judgment stage. *Usery v. Int'l Org. of Masters, Mates & Pilots, Int'l Maritime Div.,* 538 F.2d 946, 949 n.5 (2d Cir.1976) (stating that the language of 402(c) "is not to be read literally and summary judgment lies in a proper case."); *Brock v. Local 471, Hotel, Motel & Restaurant Employees & Bartenders Union,* 706 F. Supp. 175, 179 (N.D.N.Y.1989) (holding that "to the extent that defendant Local 471 claims that a trial is statutorily required, and that summary judgment cannot be had under any circumstances, it is in error"). The Department of Labor is therefore entitled to judgment as a matter of law where it has met "the usual Fed. R. Civ. P. 56 standards." *Herman v. New York Metro Area Postal Union*, 30 F. Supp. 2d 636, 642

21

(S.D.N.Y. 1998) ("'If there are no material issues of fact in dispute and the violation of § 481 'may have affected' the election results then summary judgment would be proper[.]'" (quoting *Brock,* 706 F.Supp. at 179)).

The facts giving rise to PSOU's violations of Sections 401(e) and 401(c) of the LMRDA are uncontested. *See generally* Ex. 1. There is no genuine dispute of fact relevant to the question of whether PSOU failed to provide its members with corrected notice of the election times and procedures, *see* Ex. 1 at ¶¶ 23-24; ECF No. 14 at 6 n.3, or whether PSOU permitted two members to walk the ballot box around, without notice and outside the stated voting hours, during only certain shifts at the FDA White Oak worksite. *See* Ex. 1 ¶¶ 23, 26, 31-32. Any explanation that PSOU may put forward regarding whether those actions were fair or justified is irrelevant to the legal determination of its compliance with the LMRDA and does not preclude summary judgment. *See Acosta v. Loc. 41, Int'l Bhd. of Teamsters*, 2020 WL 11563944, at *3-4 (W.D. Mo. Feb. 10, 2020) (stating that the union's explanation of the steps it took to correct confusing voting instructions did "not create a factual issue as to whether intelligible instructions were provided" and granting summary judgment to the Secretary because "the voting procedure itself was problematic").

As discussed above, PSOU must now come forward with "tangible" evidence that the outcome was not affected. *Wirtz*, 391 U.S. at 507–08. If PSOU fails to do so at this point, summary judgment for the Department is warranted. *See Chao v. Allied Pilots Ass'n,* 2007 WL 518586, at *11 (N.D. Tex. Feb. 20, 2007), *vacated pursuant to settlement* (June 13, 2007) ("Had [the union] failed to present any tangible evidence that its failure to assure ballot secrecy in its 2004 national election did not affect the outcome of the election, DOL could properly rely on the presumption that a violation of LMRDA in the conduct of a union election may have affected the outcome of

22

the election. And, under that circumstance, summary judgment would be proper."); *Reich v. United Mine Workers of Am.*, 1995 WL 791950, at \*6 (D.D.C. Oct. 24, 1995) (awarding summary judgment for the Secretary where the "defendant did not raise a single argument against finding that the violations may have affected the outcome of the election" in its opposition); *Walsh v. Loc. 688, Int'l Bhd. of Teamsters,* 639 F. Supp. 3d 887, 891 (E.D. Mo. 2022) (granting summary judgment to the Secretary on his claim that the union failed to provide adequate safeguards and rejecting the union's argument that it was the Secretary's burden to produce evidence that the outcome of the violation was affected, stating that this reading "flips the burden-shifting framework on its head").

PSOU had an opportunity to address these violations when the Complainant raised it through the internal protest procedures. Ex. 1 ¶¶ 47-49. PSOU has now also had an opportunity to engage in factual discovery – an opportunity that it declined. Accordingly, this matter may be properly resolved on summary judgment.

## CONCLUSION

For the foregoing reasons, the Department of Labor respectfully requests that the Court enter an order: (i) granting this Motion, (ii) entering judgment on both counts in the Complaint, (iii) declaring that the September 30, 2022 Election of union officers conducted by PSOU for the offices of President and three Trustees is void; (iv) directing Defendant to conduct a new election for these offices under Plaintiff's supervision and in accordance with all controlling legal authorities; (v) awarding to Plaintiff all costs associated with prosecuting this action, including but not limited to, a filing fee, as authorized by 28 U.S.C. § 2412(a)(2); and (vi) providing any other relief as the Court deems just and reasonable, and as the circumstances may require.

Respectfully submitted,

Erek L. Barron
United States Attorney


 /s/ Matthew A. Haven
Matthew A. Haven
Assistant U.S. Attorney
U.S. Attorney's Office
District of Maryland
36 S. Charles Street, 4th Fl.
Baltimore, MD 21201
(410) 209-4800

24